IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS

| | |
|---|---|
| UNITED STATES OF AMERICA, ) | |
| ) | |
| Plaintiff, ) | |
| ) | Case No. 15-CR-299 |
| v. ) | |
| ) | Judge Sara L. Ellis |
| MATTHEW BROWN, ) | |
| ) | |
| Defendant. ) | |

**DEFENDANT'S SENTENCING MEMORANDUM**

**NOW COMES,** the Defendant, **MATTHEW BROWN,** by and through his attorneys, **JAMES M. RYAN** and **RICHARD M. BEUKE**, and pursuant to Rule 32 of the Federal Rules of Criminal Procedure, 18 U.S.C. § 3553(a), and the Sixth Amendment to the Constitution of the United States, respectfully submits this Sentencing Memorandum in support of his request for the statutory mandatory minimum sentence of incarceration for fifteen years, followed by five years of Mandatory Supervised Release ("MSR"). Such a sentence is sufficient, but not greater than necessary to comply with the purposes of sentencing, and in support thereof, Mr. Brown states the following:

**I.     INTRODUCTION**

In early 2015, shortly after Mr. Brown turned 27 years old, he was living with his fiancée and her daughter in Montgomery, Illinois. With aspirations of owning his own restaurant, Mr. Brown worked at the local Olive Garden where he was learning how to run a kitchen. At that same time, Mr. Brown began to communicate with people on the internet who were engaged in the trading and collection of child pornography.

Influenced by that online community and burdened by major depressive disorder, Mr. Brown took inappropriate photographs of his fiancée's daughter including a photograph of his

1

fully erect penis with his fiancée's daughter, fully clothed, in the background and a close-up of his fiancée's daughter's unclothed vagina. While he did not, and was never accused of committing any sexual acts to his fiancée's daughter, he did take the photographs and keep them on his mobile phone. He deeply regrets taking the pictures, has come to realize the gravity of his actions, and is very sorry.

On February 24, 2015, Mr. Brown was contacted by an Undercover Agent ("UC") of the Federal Bureau of Investigation ("FBI") on the mobile messaging app Kik. During that conversation, Mr. Brown sent to the UC several photographs depicting child pornography that he had received from members of the online community with whom he had been communicating. While Mr. Brown did not take those photographs, did not know the victims depicted in the photographs, and never had any contact – sexual or otherwise – with the victims, he has grown to understand that the distribution of the images causes continued and repeated harm to the subjects of the photographs with each click of the mouse. For that, he is truly remorseful.

Shortly thereafter, on May 21, 2015, Mr. Brown was arrested at the Olive Garden where he worked and subsequently charged by Criminal Complaint with distribution of child pornography in violation of 18 U.S.C. § 2252(a)(2)(a). (Doc. 1). On September 17, 2015, the Criminal Complaint was superseded by a five-count Indictment charging Mr. Brown in Counts One, Two, and Three with the production of child pornography in violation of 18 U.S.C. § 2251(a) and in Counts Four and Five with distribution of child pornography in violation of 18 U.S.C. § 2252A(a)(1). (Doc. 30).

On December 8, 2016, Mr. Brown submitted to a Psychosexual Evaluation conducted by Illinois Licensed Clinical Psychologist, Sex Offender Evaluator, and Sex Offender Treatment Provider Richard "Bo" Travis, Psy.D. Dr. Travis's Report of Evaluation is attached hereto as

**Exhibit 1**.  Dr. Travis was asked to "assess Mr. Brown's cognitive, social and emotional functioning, his sexual interests, sexual history and functioning, his risk of future sexual offending, and for his treatment and monitoring needs."  **Exhibit 1**, p. 1.  He determined that the risk of Mr. Brown committing a sexual offense in the future is *Below Average* – a risk that will be further reduced with treatment.  **Exhibit 1**, p. 16.  Supporting that conclusion, in part, was his observation that Mr. Brown "demonstrated no sexual interest in males or in prepubescent persons (under 13 years old) of either gender.  **Exhibit 1**, p. 9.  In fact, Dr. Travis found that "[t]here is insufficient evidence to diagnose him with Pedophilic Disorder or any other Paraphilic Disorder at this time."  **Exhibit 1**, p. 12.  Ultimately, Dr. Travis believes that Mr. Brown could be safely monitored and treated in the community instead of a federal correctional institution if such a sentence was allowable under the statute.  **Exhibit 1**, p. 17.

On March 20, 2018, Mr. Brown withdrew his plea of not guilty and entered a plea of guilty to Counts Three and Five of the Indictment.  (Doc. 65).  On that day, he signed a Plea Agreement, (Doc. 66), and was ordered to submit to a Presentence Investigation with the United States Department of Probation.  (Doc. 65).  On June 18, 2018, United States Probation Officer Meredith A. Clifton filed her Presentence Investigation Report ("PSR"), (Doc. 69), and supplemented it on July 5, 2018, (Doc. 70).  Ms. Clifton recommended the statutory mandatory minimum sentence of 15 years' imprisonment.  (Doc. 69).

II.     **STATUTORY PENALTIES**

As a preliminary matter, Count 3 carries a statutory mandatory minimum sentence of 15 years, *see* 18 U.S.C. §2251, and Count 5 carries a statutory mandatory minimum sentence of 5 years, *see* 18 U.S.C. §2252A.  Both offenses carry a maximum fine of $250,000 and require a

3

minimum of 5 years of supervised release. Neither offense allows the Court to issue a sentence of probation. *See* 18 U.S.C. §3561.

### III. SENTENCING GUIDELINE CALCULATIONS

The sentencing guideline range applicable in this case was discussed at length in Mr. Brown's Plea Agreement, (Doc. 66), and in the PSR prepared by Ms. Clifton, (Doc. 69). The Government and Ms. Clifton have both correctly calculated Mr. Brown's Criminal History Category as I based on his wholesale lack of criminal history yielding a Criminal History Score of 0. The Government calculated Mr. Brown's offense level as 45 in Mr. Brown's Plea Agreement, (Doc. 66), and Ms. Clifton calculated an offense level of 39 in her PSR (Doc. 69). As outlined below, the appropriate offense level in this case should be 38. Notwithstanding Mr. Brown's sentencing calculation, a variance below the guideline calculation to the statutory mandatory minimum sentence of fifteen years is appropriate in this case.

### a. Guideline Calculation for Count Three

With respect to the guideline calculation for Count Three (18 U.S.C. §2251(a)), the Government and Ms. Clifton came to different conclusions. Specifically, in Mr. Brown's Plea Agreement, (Doc. 66), the Government calculated an offense level of 44. In the PSR, (Doc. 69), however, Ms. Clifton calculated an offense level of 40. The dispute revolves around the enhancement in Guideline §2G2.1(b)(4)(B), mandating a four-level enhancement where "the offense involved material that portrays . . . an infant or toddler." The Government applied the four-level enhancement where Ms. Clifton refused. In her decision not to apply the enhancement, Ms. Clifton aptly noted that the Sentencing Guidelines are devoid of a definition of the term "toddler," but a basic internet search of the term reveals that a toddler is a child under

4

the age of three. (Doc. 69, p. 8). Because the victim of this charged offense was not under the age of three, she was not a toddler and the four-level enhancement should not apply.

The adjusted offense level for Count Three should be 40.

### b. Guideline Calculation for Count Five

With respect to the guideline calculation for Count Five (18 U.S.C. §2252A(a)(1)), the Government and Ms. Clifton again came to different conclusions. In Mr. Brown's Plea Agreement, (Doc. 66), the Government Calculated an offense level of 38. In the PSR (Doc. 69), Ms. Clifton calculated an offense level of 40. The reason for the discrepancy is the two-level enhancement given by Ms. Clifton for "the use of a computer or an interactive computer service," to wit, the Kik messenger app, in the commission of the offense. USSG §2G2.2(b)(6). (Doc. 69, p. 9).

While Mr. Brown did use the Kik messenger app in the commission of the offense, which does qualify for the two-point enhancement in §2G2.2(b)(6), the Government was correct in its restraint from applying the enhancement. In an age where computers are so prevalent and interactive computer services so elemental that household appliances such as refrigerators and televisions would qualify for the enhancement, there is virtually no circumstance in which the enhancement would not apply. With such widespread use of computers and interactive computer services, the enhancement essentially increases the base level of the offense. Thus, the two-level enhancement should not be used, consistent with the Government's calculation in the Plea Agreement (Doc. 66).

Notwithstanding the discrepancy between the Government and Ms. Clifton, Mr. Brown contends that both parties erroneously applied the four-level enhancement found in §2G2.2(b)(4) for "material that portrays . . . sadistic or masochistic conduct or other depictions of violence."

None of the images that constitute the basis for Mr. Brown's plea or relevant conduct portrayed sadistic or masochistic conduct or any depiction of violence. Without such images, the four-level enhancement is improper.

The adjusted offense level for Count Five should be 34.

 c. **<u>Guideline Calculation for the Combined Offense Level</u>**

Based upon the Government's calculations in Mr. Brown's Plea Agreement, his adjusted offense level would be 42, which when combined with a Criminal History Category I would leave a guideline range of 360 to 600 months' imprisonment. (Doc. 66). In Ms. Clifton's PSR, the adjusted offense level was calculated as 39, which when combined with a Criminal History Category I provided a guideline range of 262-327 months' imprisonment. (Doc. 69). Using the calculations outlined in subparts (a) and (b) above, however, Mr. Brown's adjusted offense level and guideline range should be slightly lower than that calculated by Ms. Clifton.

Separating each Count into a different Group pursuant to USSG §3D1.2(d), Group One has an adjusted offense level of 40, while Group Two has an adjusted offense level of 34. Because Group Two is 6 levels below Group One, §3D1.4 mandates one level to be added to the higher offense level. In this case, Mr. Brown would be left with an offense level of 41. Taking into account the two-level reduction for Acceptance of Responsibility in §3E1.1(a) for pleading guilty, and the one-level reduction for Acceptance of Responsibility in §3E1.1(b) for assisting the Government in a timely manner, as discussed in the Plea Agreement and the PSR, Mr. Brown's total adjusted offense level should be 38.

With a Criminal History Category I and an adjusted offense level of 38, the guideline range for Mr. Brown's crimes would be 235-293 months' imprisonment. For the reasons stated below and for the reasons stated in Ms. Clifton's Sentencing Recommendation (Doc. 69), the

calculated guideline range is greater than necessary to meet the goals of sentencing, and this Court should grant Mr. Brown a downward variance to the statutory mandatory minimum sentence of 15 years' imprisonment.

## IV. SENTENCING FACTORS

The Supreme Court of the United States has repeatedly held that the primary touchstone of criminal sentencing is the mandatory factors set forth in 18 U.S.C. § 3553(a) – not the advisory Sentencing Guidelines. *See, e.g., Nelson v. United States*, 555 U.S. 350, 352 (2009)(*per curiam*)("The guidelines are not only *not mandatory* on sentencing courts; they are also not to be *presumed* reasonable.")(emphases in original). In fashioning a sentence that comports with the statutory mandates of § 3553(a), the Court "may *not* presume that the Guidelines range is reasonable," but instead "must make an individualized assessment based on the facts presented." *Gall v. United States*, 552 U.S. 38, 50 (2007). It is the Court's duty to "make its own reasonable application of the § 3553(a) factors, and to reject (after due consideration of) the advice of the Guidelines" if the result suggested does not comport with the sentencing court's view of an appropriate sentence. *Kimbrough v. United States*, 552 U.S. 85, 113 (2007)(Scalia, J., concurring).

The Seventh Circuit has similarly stated that the sentencing court must impose an appropriate sentence under § 3553(a) "without any thumb on the scale favoring a guideline sentence." *United States v. Sachsenmaier*, 491 F.3d 680, 685 (7th Cir. 2007). The court's "choice of sentence, whether inside or outside the guideline range, is discretionary," and the court has substantial "freedom to impose a reasonable sentence" outside the advisory range. *United States v. Demaree*, 133 S. Ct. 2072 (2013). A sentence below the advisory guideline range is appropriate where the reasons for selecting that sentence "are rooted in [§] 3553(a),

7

sufficiently individualized to the circumstances of [the] case, and generally associated with sentencing leniency." *United States v. Wachowiak*, 496 F.3d 744, 745 (7th Cir. 2007).

Pursuant to § 3553(a), the sentencing court "shall impose a sentence sufficient, but not greater than necessary, to comply with the purposes [of sentencing.]" 18 U.S.C. § 3553(a). To that end, the court is tasked with considering: the nature and circumstances of the offense; the history and characteristics of the defendant; the need for the sentence imposed to reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for the offense; the need for the sentence imposed to afford adequate deterrence to criminal conduct; the need for the sentence imposed to protect the public from further crimes of the defendant; the need for the sentence imposed to provide the defendant with needed educational or vocational training, medical care, or other correctional treatment in the most effective manner; the kinds of sentences available; the kinds of sentence and the sentencing range established in the sentencing guidelines; the need to avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct; and the need to provide restitution to any victims of the offense. 18 U.S.C. § 3553(a). After consideration of those factors, as discussed below, it will be clear to the Court that the statutory mandatory minimum sentence of 15 years is sufficient in this case, and any sentence beyond that would be greater than necessary to meet the purpose of sentencing.

    a. **The History and Characteristics of Mr. Brown**

Matthew Brown was born in Houston, Texas but raised in and around Aurora, Illinois. From the age of 2, Mr. Brown, his older brother, and his older sister lived the life of typical Illinoisans. They played in the street, rode bikes together, and explored their neighborhood. To this day, Mr. Brown counts his brother and his sister as his two best friends. As a third grader,

8

Mr. Brown watched the marriage between his father – a Navy veteran working as a computer analyst – and his mother – a kindergarten teacher-turned-ER charge nurse – deteriorate to divorce. For several years after the divorce, he lived with his father and stepmother. Then, in the seventh grade, Mr. Brown entered a two-week inpatient program after threatening to commit suicide. When he left the program, he moved in with his mother.

Upon graduation from high school, Mr. Brown decided to follow in his father's footsteps and enlist in the Navy. When the accompanying physical examination revealed a lump on one of his testicles, Mr. Brown was forced to trade the Navy for cancer treatment. Four rounds of chemotherapy and five surgeries later, his cancer remains in remission.

When Mr. Brown was able to return to work, he held jobs on the Caterpillar Emergency Response Team and cleaning up death and homicide scenes with his brother's company, Action Biocare. Unfulfilled by these lines of work, he found his way into the restaurant business. Starting as a busser, Mr. Brown worked his way through the ranks as a barback, a server, a line cook, and ultimately to a sous chef at Olive Garden. Working in the restaurant business gave Mr. Brown the satisfaction that he was unable to find in any other line of work. Upon his arrest in 2015, he was learning the ins-and-outs of running a restaurant with an eye toward opening his own eatery someday in the future. He enjoyed the camaraderie and satisfaction that came along with cooking food for other people.

Working in the restaurant business also introduced Mr. Brown to some unhealthy lifestyle choices. The late hours and social atmosphere led to drinking and smoking marijuana, which fueled the major depressive disorder by which he is burdened. The drinking and smoking negatively impacted his relationships with his family, his ex-fiancée, and her children. Through therapy and counseling, combined with eliminating those friends from his life that acted as a

negative influence, Mr. Brown has completely stopped smoking marijuana and stopped drinking. As a result, he has seen his relationship with his family blossom exponentially.

As you will read in the letter from Mr. Brown's mother, attached hereto as **Exhibit 2**, and the letter from Mr. Brown's father, attached hereto as **Exhibit 3**, he means the world to his family and his family means the world to him. His family is supportive of him and his treatment, but holds him accountable for his actions. Between his arrest and his surrender to the custody of the Bureau of Prisons, Mr. Brown was confined to his mother's home. The extensive time with his family helped Mr. Brown reassess the priorities in his life and prepare for his forthcoming sentence in the penitentiary.

While living with his mother, Mr. Brown maintained a healthy regimen of mental health treatment, and pursuant to Dr. Travis's evaluation of Mr. Brown, he has no demonstrated sexual interest in prepubescent persons of either gender. **Exhibit 1**, p. 9. His mental health treatment has helped him realize that when he began to communicate with child pornography collectors on the internet, he was looking to escape the physically and verbally abusive relationship he had cultivated with his fiancée. Since his arrest, with the help of his family and his doctors, he has found healthy ways to cope with his personal problems. His thoughts are not dominated by sexual fantasies, and his behavior is not abusive. He has begun to heal through court-ordered therapy, and will benefit greatly from the continued structure and support of mental health treatment. His lack of sexual attraction to minors and his positive reactions to mental health treatment suggest that a period of incarceration consistent with the statutory mandatory minimum of 15 years will be more than sufficient to meet the goals of sentencing, and anything longer would be much greater than necessary.

b. **The Nature and Circumstances of the Offense**

Mr. Brown understands that his conduct in this case has not only hurt himself and his family, but has destroyed his relationship with his fiancée and has caused her daughter a lifetime of emotional instability. While he is proud of the majority of time he spent as a father figure to her daughter, he is painfully aware of the fact that his actions in this case have caused irreparable harm to her and starkly overshadow all of the good things he provided for her.

While Mr. Brown knows that he has deeply hurt his ex-fiancée's daughter and all of the children depicted in the images he shared, Dr. Travis found that "[t]here is insufficient evidence to diagnose [Mr. Brown] with Pedophilic Disorder or any other Paraphilic Disorder. . . ." **Exhibit 1**, p. 9, 12. Mr. Brown's trafficking in child pornography and participation in its dissemination in this case is not borne of a psychosexual attraction to children. That fact certainly cuts both ways, supporting the conclusion that Mr. Brown should not only have known better, but was guided by something other than sexual impulse, while also supporting the prediction that he is less of a risk to reoffend than other similarly-situated defendants. It is with that understanding, as described below, that this Court should sentence Mr. Brown to the statutory mandatory minimum of fifteen years' imprisonment. Such a sentence would be sufficient, considering the nature and circumstances of the offenses themselves, but anything longer would be more than necessary to fulfill the purposes of sentencing.

c. **Deterrence from future criminal activity and the need to protect the public from further crimes**

Sentencing Mr. Brown to the statutory mandatory minimum sentence of 15 months would be sufficient to deter Mr. Brown from future criminal activity and to protect the public from further crimes, and anything over the statutory mandatory minimum of 15 years would be greater than necessary. The arrest and pretrial home confinement of Mr. Brown alone have been

sufficient to deter him from a life of future crime. His time on home confinement has brought him closer to his family, which has afforded him a strong accountability structure. **Exhibit 1**, p. 4. Similarly, home confinement has allowed him to "abandon[] relationships with previous friends who helped maintain his use of cannabis." **Exhibit 1** p. 17. Although incarceration runs the risk of exposing Mr. Brown to the influence of other criminals, he understands that probation is not an option at sentencing. With that being said, he will continue to rely upon the support and accountability structure he has built with his family, and as discussed below, will benefit from further counseling and support while incarcerated. **Exhibit 1** p. 17 ("His family supports are likely sufficient to support him to complete any recommended treatment and to maintain pro-social law-abiding behaviors moving forward.").

The statutory mandatory minimum of 15 years will likewise be sufficient to protect the public from further crimes at the hands of Mr. Brown, and anything more would be greater than necessary. As a result of the arrest in this case, Mr. Brown has begun to seek the counsel of mental health professionals. His participation in that therapy "appears to have resulted in significant maturing, metacognitive skills (e.g., ability to identify and change cognitive distortions), and effective emotional regulation." **Exhibit 1**, p. 6. His further participation in therapy will only continue to help him avoid the type of decision-making that led him to commit the crimes in this case.

According to Dr. Travis, "Mr. Brown's risk of future sexual offending is Below Average." **Exhibit 1**, p. 16. Specifically, Mr. Brown's performance on the *Abel Assessment of Sexual Interest–3* ("*AASI-3*") test "demonstrated no sexual interest in males or in prepubescent persons (under 13 years old) either gender," leading Dr. Travis to opine that "[t]here is insufficient evidence to diagnose him with Pedophilic Disorder or any other Paraphilic Disorder.

. . ." **Exhibit 1**, p. 9, 12. Similarly, Mr. Brown scored a 1 on the *Static-99R* test that is used to predict sexual and violent recidivism for sexual offenders. **Exhibit 1**, p. 14-15. Based on that score, if Mr. Brown commits to meaningful treatment, he is less likely than the typical sex offender to reoffend. **Exhibit 1**, p. 15. With that being said, "[i]n [Dr. Travis's] clinical opinion, the *Static-99R* likely overestimates Mr. Brown's risk of future sexual offending. . . ." **Exhibit 1**, p. 15. Thus, the statutory mandatory minimum sentence of 15 years would not only be sufficient to deter Mr. Brown from committing future crimes, but would also be sufficient to protect the public from Mr. Brown.

### d. The need for the sentence to provide Mr. Brown with needed services

Sentencing Mr. Brown to the statutory mandatory minimum sentence of 15 years in this case would be sufficient to provide Mr. Brown with the counseling services he will need to return to society as a productive member, and anything longer would be greater than necessary. As noted above, Mr. Brown's "current participation in therapy appears to have resulted in significant maturing, metacognitive skills, and effective emotional regulation." **Exhibit 1**, p. 6. Moving forward, he will need continued treatment from a Licensed Sex Offender Treatment Provider that will "focus on the decision-making processes he engaged in which led to his current charges[,] develop and implement cognitive desistance strategies to prevent future sexual offending behavior[,] address his motivation for engaging in behaviors that led to his current charges[, help him] learn how to increase intimacy and learn how to manage the relationship between intimacy and sexuality[, and] develop a wellness plan (or Good Lives Plan) identifying goals and strategies for fulfillment and balance across life domains (e.g., social, community, vocational, autonomy and intimacy, and integrity)." **Exhibit 1**, p. 16-17. In fact, the risk and

needs levels discussed above suggest that Mr. Brown would benefit from "a mix of group and individual treatment." **Exhibit 1**, p. 16-17.

Dr. Travis opined that Mr. Brown's risk level supports the conclusion that "he could be safely monitored . . . and treated in the community." **Exhibit 1**, p. 17. Obviously, the Court is statutorily mandated to sentence Mr. Brown to 15 years' imprisonment, but anything over the statutory mandatory minimum would be greater than necessary to ensure that Mr. Brown will get the services he needs. Certainly Mr. Brown will have access in the Bureau of Prisons to the type of treatment described above, and "if Mr. Brown completes the treatment . . . his Below Average risk of future sexual offending will be further reduced." **Exhibit 1**, p. 17.

### e. Restitution to the victims of the Offense

Finally, pursuant to Mr. Brown's Plea Agreement (Doc. 66) and the U.S. Code, 18 U.S.C. § 2259, he has agreed to pay restitution to Victim A to compensate for the cost of counseling she must undergo as a proximate result of his conduct in this case. The Supreme Court interprets 18 U.S.C. § 2259 to require restitution "only to the extent the defendant's offense proximately caused a victim's losses." *Paroline v. United States*, 572 U.S. 434, 448 (2014). While the Court declined to "prescribe a precise algorithm for determining the proper restitution amount," a set of "rough guideposts" was enumerated for courts to consider in assessing restitution under § 2259:

> "[1.] the number of past criminal defendants found to have contributed to the victim's general losses; [2.] reasonable predictions of the number of future offenders likely to be caught and convicted for crimes contributing to the victim's general losses; [3.] any available and reasonably reliable estimate of the broader number of offenders involved (most of whom will, of course, never be caught or convicted); [4.] whether the defendant reproduced or distributed images of the victim; [5.] whether the defendant had any connection to the initial production of the images; [6.] how many images of the victim the defendant possessed; and [7.] other facts relevant to the defendant's relative causal role."

*Id.* at 459-460. Ultimately, "an order of restitution under this section shall be issued and enforced in accordance with section 3664, which in turn provides in relevant part that the burden

of demonstrating the amount of the loss sustained by a victim as a result of the offense shall be on the attorney for the Government." *Id.* at 443 (internal quotations omitted).

To aid the Court in determining the appropriate amount of restitution Mr. Brown must pay to Victim A, the Illinois Department of Children and Family Services has estimated that she has incurred $7,300 to date for treatment, will need an additional evaluation at a $1,200 price point, and will need 20 years of counseling at $2,500 per year for a grand total of $58,500 in treatment costs. Without having access to documentation of the cost of the victim's prior counseling, Mr. Brown is not in a position at this time to agree or object to that amount. Additionally, since Mr. Brown's arrest in 2015, Victim A has been removed from her mother's custody for reasons unrelated to Mr. Brown's conduct in this case; certainly the child's separation from her mother is a contributing cause to her ongoing counseling needs. An accounting that takes into consideration the mother's share of the blame would be appropriate in this matter.

Mr. Brown fully understands that Victim A is a victim of his actions and is likely to be victimized by those actions well into her adult life. However, the portion of her continued counseling for which he is the proximate cause is mitigated by the portion for which her Mother's abandonment is a proximate cause and some of the continued victimization that child pornography victims experience in other cases is not present in this case. Specifically, there is no indication that Victim A is aware of the fact that she was victimized by Mr. Brown, nor any evidence that Mr. Brown disseminated her image to anyone other than the Government's undercover agent, so the re-victimization associated with distribution of those images will not occur. Ultimately, Mr. Brown accepts his role in Victim A's need for continued treatment and will dutifully pay what this honorable Court deems is appropriate.

With respect to restitution for members of the "Sweet Sugar Series" and "8 Kids Series" referenced in the PSR (Doc. 69) and the Government's Version of the Offense attached to the PSR (Doc. 69), there is scant evidence that those victims are entitled to any restitution in this case, let alone the amount of restitution sought relative to the allegations made against Mr. Brown. Specifically, attorneys for "Pia," "Ava," and "Mya" (the victims depicted in the "Sweet Sugar Series") have requested $5,000 in restitution from Mr. Brown for each of the three victims. Attorneys for "John Does I-V" (five of the victims depicted in the "8 Kids Series") have requested $25,000 in restitution from Mr. Brown for each of the five victims.

In *Paroline*, the Supreme Court not only addressed how restitution calculations should be determined, but also to whom restitution should be granted. In doing so, the Supreme Court noted that "a straightforward reading of § 2259(c) indicates that the term 'a crime' refers to the offense of conviction," before determining that "§ 2259 is intended to compensate victims for losses caused by *the offense of conviction*." *Paroline*, 572 U.S. 445 (emphasis added). Mr. Brown pled guilty to Count Three and Count Five of the Indictment (Doc. 66). Neither *offense of conviction* involves the possession, transmission, or production of images from the "Sweet Sugar Series" or the "8 Kids Series." Therefore, the victims depicted in those images are not entitled to restitution from Mr. Brown. *See United States v. Delacruz*, 2:12-CR-00132 (GEB)(December 17, 2015, E.D.C.A.).

Assuming *arguendo* that Mr. Brown was responsible for restitution to those victims, the amount requested by their attorneys does not reflect Mr. Brown's causal role in their loss. Using the "rough guideposts" enumerated in *Paroline*, *supra*, neither Mr. Brown, nor the Government, nor the Court has sufficient information to determine an appropriate amount of restitution. As an initial matter, there is no evidence that Mr. Brown was in possession of photographs from the

16

"Sweet Sugar Series" and "8 Kids Series" – only an assertion to such in the Government's Version of the Offense attached to the PSR (Doc. 69). If Mr. Brown was in possession of the "8 Kids Series," for example, there is no evidence that he was in possession of photographs of John Does I-V, as they represent only five of the "8 Kids." *See United States v. Hernandez*, 2:11-CR-00026, p. 11 (GEB)(June 26, 2014, E.D.C.A.). There is similarly no evidence about "the number of past criminal defendants found to have contributed to the victim's general losses" by possessing, distributing, and producing the images. *Paroline*, 572 U.S. at 460. There are no "reasonable predictions of the number of future offenders likely to be caught and convicted for crimes contributing to the victim[s'] general losses" or "any available and reasonably reliable estimate of the broader number of offenders involved." *Id.* And ultimately there is no evidence as to "how many images of the victim[s] the defendant possessed," if any. *Id.* It is impossible to calculate the appropriate restitution without all of the information above, assuming restitution is appropriate at all, but even without the missing information, the requested amounts are excessive.

  Mr. Brown does not denigrate the needs of the victims of the "Sweet Sugar Series" and the "8 Kids Series," but the statutes and caselaw governing restitution remove him from responsibility for restitution for those needs. He has learned through this case and his conduct with respect to Victim A that the victimization of the subjects of child pornography continues well beyond the moment the image is captured, and takes responsibility for that with respect to Victim A. While he understands that restitution is mandatory under § 2259(b)(4)(B)(i) regardless of his "economic circumstances," Mr. Brown asks the Court to consider the fact that he has not been employed since his arrest in 2015, faces over a decade in the custody of the

17

Department of Corrections, and faces of lifetime of registry as a sex offender when weighing the *Paroline* factors to determine the amount of restitution he will owe Victim A.

V. **CONCLUSION**

Matthew Brown takes full responsibility for his actions. Nobody forced him to join the nefarious online community of child pornography collectors; nobody forced him to take photographs of his fiancée's daughter; and, nobody forced him to download the Kik messenger app and trade pictures. For his actions, Mr. Brown must serve at least fifteen years in a federal penitentiary. When this Court assesses this case, however, Mr. Brown respectfully asks that due consideration be paid to the relatively law-abiding life he has otherwise lived, his willingness to freely and openly admit to his crime, and the assessments of Dr. Travis and Ms. Clifton. Fifteen years is a substantial amount of time to be separated from his support structure, it is a sufficient amount of time to grow from his decisions, and it is not longer than necessary to protect the community from the threat of future crimes at the hands of Mr. Brown. A sentence longer than fifteen years would be much greater than necessary to deter Mr. Brown from committing future crimes.

Mr. Brown is lucky to have a close bond with his family. He is woefully aware that his victim does not share the same privilege. He regrets the part he has played in the deterioration of her family life, and regrets the part he has played in the deterioration of his own family life. But Mr. Brown is lucky because he has a strong family unit that will accept him back into their lives upon his release from incarceration in fifteen years and support him as he transitions back into being a fruitful member of society.

**WHEREFORE**, Mr. Brown respectfully asks this Court to issue the only sentence that is sufficient, but not greater than necessary in this case: 15 years.

Respectfully submitted,

/s/ James M. Ryan
James M. Ryan
Attorney for the Defendant,
Matthew Brown

/s/ Richard M. Beuke
Richard M. Beuke
Attorney for the Defendant,
Matthew Brown

**JAMES M. RYAN**
1555 Bond Street, Suite 103
Naperville, Illinois 60563
(630) 596-9400 – phone
(630) 596-9402 – fax

**RICHARD M. BEUKE**
801 N. Cass Avenue, Suite 200
Westmont, Illinois 60559
(312) 427-3050 – phone
(312) 427-1215 – fax

## CERTIFICATE OF SERVICE

I, Richard M. Beuke, Attorney at Law, hereby certify that Defendant's Sentencing Memorandum was served on July 1, 2019, in accordance with Federal Rule of Criminal Procedure 49, Federal Rule of Civil Procedure 5, Local Rule 5.5, and the General Order on Electronic Case Filing (ECF) pursuant to the District Court's system for ECF filers.

/s/ Richard M. Beuke
Richard M. Beuke
801 N. Cass Avenue, Suite 200
Westmont, Illinois 60559
(312) 427-3050 – phone
(312) 427-1215 – fax